IN THE CIRCUIT COURT, FOURTH JUDICIAL
CIRCUIT IN AND FOR DUVAL COUNTY, FLORIDA.

CASE NO.: 16-2019-CA-007070

DIVISION: CV-C

KALIA LUCAS and
KHLAYAH WRIGHT,

        Plaintiffs,

v.

DUVAL COUNTY SCHOOL BOARD
and EVENT SERVICES AMERICA, INC.,

        Defendants.

_____/

## PLAINTIFF KHLAYAH WRIGHT'S MOTION FOR
## LEAVE TO FILE FOURTH AMENDED COMPLAINT

**NOW COMES** the Plaintiff, Khlayah Wright, by and through undersigned counsel, with

the following Motion for Leave to File a Fourth Amended Complaint, and states:

This action arises out of an August 24, 2018 shooting at Raines High School.  Plaintiff,

then age 16, was an innocent bystander in a shooting committed by Duval County public school

student Robert Howard (age 16).  Joerod Adams (age 19) was shot in the head and killed instantly.

Willie Royal (age 17) was also shot.

The case went to trial in July 2022, and ended with a mistrial due to a hung jury.  At trial

and during this litigation, Defendant made representations such as: "There is no record evidence

that any altercation or disturbance occurred before the shooting that would have alerted school

personnel."  Exh. 1. at p. 5. And "As to Plaintiffs contention that DCSB 'simply moved [the

individuals ejected] from the stadium to a school courtyard next to the stadium,' Plaintiffs have

not established any evidence this was causally related to the shooting that occurred after the game.

To the contrary, it was the DCSB's practice to escort someone off campus where an ejection was made. See Depo. B. Stallings P. 35. There is no evidence that DCSB deviated from this general practice." *Id*. at 8.

One month after the above trial, Florida's Statewide Grand Jury unsealed a report which had been confidential since January 15, 2021. Exh. 2. The report discusses the subject shooting, and the actions of then director of Duval County School Police, Micheal Edwards.  The report states in pertinent part:

> We also heard testimony that a student was taken into custody during a high school football game for fighting and disorderly conduct. The officers at the scene intended to either contact the student's parents, cite him (including issuing him a trespass warning to remain away from the location) and release him to their custody or, if they could not be contacted to arrest the student and remove him from the premises. Edwards, when informed of the situation, ordered the officers to immediately release the student with no further action. The student remained on the premises and, tragically, was shot to death near the end of the game in an altercation which apparently had continued from the previous incident. Exh. 2 at p. 12.

The report cites the foregoing as an example of Mr. Edwards ordering officers to "un-arrest" certain individuals.  The report notes other problems within DCSB and Mr. Edwards, then states:

> "While we certainly do not lightly come to the following decision, we have reviewed multiple criminal statutes over the course of our investigation, and find the following to apply to Edwards' conduct as described above:
>
> **1) Solicitation of Official Misconduct (Third-Degree Felony)**
> Micheal P. Edwards did solicit a public servant or public contractor to knowingly and intentionally obtain a benefit for any person by falsifying, or causing another person to falsify, any official record or official document or obstructing, delaying, or preventing the communication of information relating to the commission of a felony that directly involves or affects the government entity served by the public servant or public contractor, and in the course of such solicitation did command, encourage, or request another person to engage in specific conduct which would constitute such offense or attempted offense, Contrary to sections 838.022, 777.01 I and 777 .04(2), Florida Statutes.

**2) Official Misconduct (Third-Degree Felony)**
Micheal P. Edwards, while a public servant or public contractor, did knowingly and intentionally obtain a benefit for any person by falsifying, or causing another person to falsify, any official record or official document or obstructing, delaying, or preventing the communication of information relating to the commission of a felony that directly involves or affects the government entity served by the public servant or public contractor, contrary to sections 838.022 and 777.011, Florida Statutes.

**3) Falsifying Records (First-Degree Misdemeanor)**
Micheal P. Edwards did alter, falsify or avoid any record or did cause or procure any of the offenses aforesaid to be committed, or was in anywise concerned therein, contrary to Section 839.13, Florida Statutes.

To borrow a phrase, in this instance, the coverup is actually part of the crime." Exh.

2 at p. 13.

## Argument & Memorandum of Law

Plaintiffs seek leave to file an amended complaint adding Micheal Edwards in his individual capacity and asserting a claim against him and Defendant DCSB for civil rights violations pursuant to 42 U.S.C. § 1983.  Plaintiffs' proposed Fourth Amended Complaint is attached.

Rule 1.250(c), *Fla. R. Civ. P.,* states:

 (c) Adding Parties. Parties may be added once as a matter of course within the same time that pleadings can be so amended under rule 1.190(a). If amendment by leave of court or stipulation of the parties is permitted, parties may be added in the amended pleading without further order of court. Parties may be added by order of court on its own initiative or on motion of any party at any stage of the action and on such terms as are just.

Rule 1.190, *Fla. R. Civ. P.* states:

A party may amend a pleading once as a matter of course at any time before responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed on the trial calendar, may so amend it at any time within 20 days after it is served. Otherwise a party may amend a pleading only by leave of court or by written consent of the adverse party. If a party files a motion to amend a pleading, the party shall attach the proposed amended pleading to the motion. Leave of court shall be given freely when justice

so requires. A party shall plead in response to an amended pleading within 10 days after service of the amended pleading unless the court otherwise orders.

In 1995, the 2nd DCA held: "The public policy of Florida is to freely allow amendment of pleadings." *Carter v. Ferrell*, 666 So. 2d 556, 557 (Fla. 5th DCA, 1995). "A claim under 42 U.S.C. § 1983 may be brought in state court." *Jackson v. State*, 829 So. 2d 942, 943 (Fla. 3d DCA, 2002). For the foregoing reasons, justice requires the above amendments. The subject Motion and related relief are not being pursued for the purposes of delay. The Fourth Amended Complaint is attached as Exhibit 3. Plaintiffs request an Order granting the subject motion.

**SPOHRER & DODD, P.L.**

**/s/Matthew W. Spohrer**

**ROBERT F. SPOHRER, ESQUIRE**
Florida Bar No.: 184500
**MATTHEW W. SPOHRER, ESQUIRE**
Florida Bar No: 0062534
76 S. Laura Street, #1701
Jacksonville, FL 32202
Phone: (904) 309-6500
Facsimile: (904) 309-6501
Email:   rspohrer@sdlitigation.com
              jheape@sdlitigation.com
              mspohrer@sdlitigation.com
              eservice@sdlitigation.com
**Attorneys for Plaintiffs**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing was e-filed and e-served through the State of Florida e-portal system to Gaby Young, Esquire and Brett Mereness, Esquire; Office of General Counsel; 117 W. Duval St., Suite 480, Jacksonville, FL 32202, Attorneys for Defendant Duval County School Board, this 24th day of August, 2022 at the following e-mail addresses:

gcyoung@coj.net
hdugan@coj.net
brettm@coj.net
bosburn@coj.net

**/s/Matthew W. Spohrer**
Attorney

Filing # 138020244 E-Filed 11/05/2021 04:04:10 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT IN AND FOR
DUVAL COUNTY, FLORIDA

KALIA LUCAS
and KHLAYAH WRIGHT,

        Plaintiffs,

CASE NO.: 2019-CA-007070
DIVISION: CV-C

v.

DUVAL COUNTY SCHOOL BOARD,
and EVENT SERVICES AMERICA, INC.,
a Florida Corporation,

        Defendants.

_____/

## AMENDED MOTION FOR SUMMARY JUDGMENT

    Defendant Duval County School Board ("DCSB") moves for summary judgment pursuant to Fla. R. Civ. P. 1.510 on the grounds that there is no genuine dispute as to any material fact and that Defendant is entitled to judgment as a matter of law. In support of this amended motion, Defendant states as follows:

    1.    This action arises from an August 24, 2018 shooting that occurred when "an assailant armed with a gun entered the grounds of Raines High School and opened fire into a crowd of spectators who were in the process of leaving the area of the football field." (Doc. 61 [Third Am. Compl.], ¶ 17) Plaintiff Khlayah Wright was injured in the shooting. (Doc. 61, ¶ 19)

    2.    Plaintiffs allege that DCSB breached its "general duty of supervision and breached its duty to protect Khlayah Wright from assaults by other students and non-students." (Doc. 61, ¶ 27) It is undisputed, however, that the shooting occurred at a football game open to members of the general public. Contrary to the conclusory allegations of the third amended complaint, DCSB did not owe a duty as claimed by the Plaintiffs. There is no summary judgment evidence that would support application of any exceptions to the public duty doctrine.



3.      Even if DCSB owed a duty to the Plaintiffs, there is no evidence in the record that DCSB breached any duty. For instance, Plaintiffs claim that DCSB was "on notice of the shooter's violent nature and past dangerous actions" and "knew or should have known that the shooter was a danger to any person lawfully on the Raines H.S. premises."  (Doc. 61, ¶¶ 32-33) However, no evidence supports the allegations of the complaint regarding actual or constructive notice of the shooter's dangerous propensities.

4.      No evidence supports Plaintiffs' contentions that any action or inaction of DCSB caused the injuries to Khlayah Wright. The alleged facts that Plaintiffs rely on to support their cause of action consist of mere speculation and conjecture, which is insufficient to meet their burden of proving the allegations of the complaint.

5.      In addition, to the extent that Plaintiffs' claims against DCSB are based on a lack of an adequate security plan, inadequate number of police and security personnel present, placement of lighting, or inadequate training of security, such claims are barred by sovereign immunity.  Fla. Stat. § 768.28.  No evidence overcomes the sovereign immunity bar in this action.

6.      Plaintiffs bear the burden of proving each element of their case, whether framed as general negligence (Count I) or premises liability (Count II). Based on the evidence in the record, they are unable to meet this burden. There is thus no evidence "such that a reasonable jury could return a verdict for the nonmoving party," and DCSB is entitled to summary judgment. In re Amendments to Fla. R. Civ. P. 1.510, 317 So. 3d 72, 75 (Fla. 2021) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**MEMORANDUM OF LAW**

I.      **Standard on Summary Judgment**

As this Court recently held, Fla. R. Civ. P. 1.510 as amended in 2020 is now

construed and applied in accordance with the federal summary judgment standard. … [T]he burden is not on the moving party "to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof. … Instead … the burden on the moving party may be discharged by 'showing' – that is, pointing out to the [trial] court – that there is an absence of evidence to support the nonmoving party's case."

(Final Summary Judgment in favor of ESA, Doc. 343 p. 2 (citations omitted).) In rebutting a

movant's summary judgment motion under the now-utilized federal standard, it is no longer

sufficient for the non-moving party to create an issue of fact, however credible or incredible,

substantial, or trivial, to preclude the granting of summary judgment. In adopting the language in

Anderson v. Liberty Lobby, Inc., the Florida Supreme Court noted that if the non-moving party's

evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

No. SC-20-1490; 477 U.S. 242, 247-48 (1986) ("by its very terms [the summary judgment]

standard provides that the mere existence of some alleged factual dispute between the parties will

not defeat an otherwise supported motion for summary judgment.")  Under the new standard, a

dispute is "genuine," and thereby precludes summary judgment, only when "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 284.

Additionally, when considering the legal sufficiency of an evidence submitted in

opposition, the court must consider whether it would be admissible at trial of the cause. Gonzalez

v. Citizens Property Ins. Corp., 273 So. 3d 1031, 1036 (Fla. 3d DCA 2019) ("the focus is on

whether the affidavits show evidence of a nature that would be admissible at trial." (citing

Hernandez v. United Auto. Ins. Co., 730 So. 2d 344, 345 (Fla. 3d DCA 1999)).  "It is well

established that affidavits ... which are based entirely upon speculation, surmise and conjecture,

are inadmissible at trial and legally insufficient to create a disputed issue of fact in opposition to a

motion for summary judgment." Morgan v. Cont'l Cas. Co., 382 So. 2d 351, 353 (Fla. 3d DCA

1980) (citations omitted).

This new standard is fundamentally the same as on directed verdict. When opposing parties tell two different stories, one of which is blatantly contradicted by the records, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment. <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## II.   Pleadings and Material Facts

The Third Amended Complaint is the operative pleading in this matter. Therein, Plaintiffs claim that DCSB "owed a general duty of supervision to the students" and "also owed a duty, at all times material, to protect its students, including Khlayah Wright from assaults by other students and non-students." (Doc. 61, ¶¶ 26, 27.) As to their theory of premises liability, Plaintiffs have asserted that DCSB "knew or should have known that the shooter was a danger to any person lawfully on the Raines H.S. premises." (Doc. 61, ¶ 33.) Plaintiffs also claim that the violent actions of the shooter and the shooting that occurred "were reasonably foreseeable to Defendant." (Doc. 61, ¶ 34.) However, there is no record evidence to support either of these assertions.

It is undisputed that the incident occurred after the game ended, and outside the gates of the football stadium. (Doc. 61, ¶ 19.) There is no evidence of any notice to DCSB that there was any type of impending altercation, much less the shooting that occurred. No evidence exists to establish DCSB had any prior knowledge that the assailant would commit the acts giving rise to this lawsuit. There is nothing that would establish liability on the part of DCSB with respect to the football game held at Raines High School on the date of the incident.

Raines High school administrative staff, including the principal and assistant principals, had a meeting the week of the game with Duval County School Board Police to discuss personnel and where they would be stationed for the first home game of the season. <u>See</u> Depo. B. Stallings P. 9-10. These administrators for Raines High School were stationed throughout the stadium

4

during the game where they monitored traffic on and off the field, and if they noticed anything, were to report it to a police officer. Id. at P. 14.

In addition to the school administrators, the DCSB had twenty-two police officers at the game along with security guards employed by Event Services America. See Depo. S. Johnson P. 10, 56; Exhibit 3 (Tactical Action plan). Jacksonville Sheriff's Officers were also providing security for the football game. Id. at 56-7. Before the game began on August 24, 2018, the DCSB officers had a meeting to discuss the security plan for the game and provided its officers with a tactical action plan. Id. at 8-9. The tactical action plan contained the security/tactical positions and duties for each DCSB police officer before, during and after the football game. Id.

After the game, administrators, teachers, and police officers responded to locations around the stadium and ushered the crowd out in waves. See Depo. B. Stallings P. 14-15. This involved the administrators and police officers being dispersed throughout the crowd to assist and monitor the flow of the leaving spectators. Id. After the game ended, Assistant Principal Stallings was in the courtyard area along with police officers. Id. at 16.

Principal Hall and Assistant Principal Stallings were in the immediate area when the shooting occurred. Id. at 19. Assistant Principal Stallings testified that there was a post lamp not too far from her position. Id. at 18. There is no record evidence that any altercation or disturbance occurred before the shooting that would have alerted school personnel. To the contrary, Assistant Principal Stallings observed a student, unrelated to the shooting, with a funny look on his face so she immediately radioed the school resource officer, Officer Johnson, that she may need some assistance. See Depo. B. Stallings P. 44. Notably, this student was immediately adjacent to the "really bright" street lamp. Id. at 45.

After being radioed by Assistant Principal Stallings, Officer Johnson testified that it took ten to fifteen seconds between getting the call on the radio from the administrator and hearing the gunshots.  <u>See</u> Depo. B. Stallings P. 23.  During those ten to fifteen seconds, Officer Johnson was headed to the courtyard.   <u>Id.</u>   In total, it took this DCSB officer a mere thirty seconds to immediately respond to the area where the shooting occurred from where he was located at the football stadium entrance adjacent to the concession stand.   <u>Id.</u>  at 24.  No testimony or record evidence supports that there was any indication, much less knowledge on the part of DCSB, that the shooting was going to occur.

## III.   Argument

### A.   Plaintiffs' claims against DCSB are barred by the public duty doctrine.

It is well settled that "government liability may not be established unless there is a common law or statutory duty of care owed by the government to the individual rather than to the general public." <u>Manfre v. Shinkle</u>, 184 So. 3d 641, 645-46 (Fla. 5th DCA 2016) (citations omitted). There are four exceptions to the public duty doctrine:

> A *special tort duty* ... arise[s] when law enforcement officers become *directly involved* in circumstances which place people *within a "zone of risk"* [1] by *creating or permitting* dangers to exist, [2] by taking persons into police *custody*, [3] *detaining* them, *or* [4] *otherwise subjecting them to danger.*

<u>Wallace v. Dean</u>, 3 So. 3d 1035, 1048 (Fla. 2009) (quoting <u>Pollock v. Fla. Dep't of Highway Patrol</u>, 882 So. 2d 928, 935 (Fla. 2004). In the instant case, DCSB was at best "engaged in the protection of the general public" present at the football game. <u>Wallace</u>, 3 So. 3d at 1049. There were no actions of DCSB that placed Wright in a "zone of risk"

The mere fact that Wright was a student in the DCSB system is insufficient to impose a duty under these circumstances. School officials and teachers are neither insurers of their students' safety, nor are they strictly liable for any injuries which may be sustained by the students. <u>See</u>

Collins v. School Bd. of Broward County, 471 So.2d 560, 563 (Fla. 4th DCA 1985); Benton v. School Bd. of Broward County, 386 So.2d 831, 834 (Fla. 4th DCA 1980). Florida law, however, imposes a duty of reasonable supervision upon school officials for the students' activities while the school is entrusted with their care. See Rupp v. Bryant, 417 So.2d 658, 666 (Fla.1982); Collins, 471 So.2d at 563; Benton, 386 So.2d at 834; Barrera v. Dade County School Bd., 366 So.2d 531, 532 (Fla. 3d DCA 1979). In the instant case, however, the shooting occurred not in a school setting, but at a football game open to the public.

**B.    Even if DCSB owed a duty to Plaintiffs, there is no evidence of any negligence of DCSB that caused injury to Wright.**

There is no evidence that DCSB had actual or constructive notice of any violent propensities of the shooter. Nor is there any evidence that DCSB had actual or constructive notice that the shooter was a danger to any person at the football game. In other words, there is no evidence supporting that the actions of the shooter and the resulting injuries to Wright were reasonably foreseeable. Therefore, Plaintiffs cannot meet their burden of proving that DCSB failed to use reasonable care.

Plaintiffs seem to contend that they are pursuing three theories to prove DCSB was negligent:

> First, Defendant claims to have "ejected" attendees (including Robert Howard) who were a "public safety issue", but DCSB simply moved them from the stadium to a school courtyard next to the stadium….This was operational negligence that is not barred by sovereign immunity. DCSB's second act of negligence was failure to use reasonable care regarding the lighting in the courtyard. Mere hours after the shooting, Duval County School Police Sergeant Lavall Thomas confirmed the lighting problem in his report as something that "could be improved." The third act of negligence not barred by sovereign immunity was the Duval School Police's failure to follow their own written policy to remain at their assigned positions and to not "bunch up" into groups of more than 2.

7

(See Plaintiff Khlayah Wright's Response and Memorandum of Law in Opposition to Duval County School Board's Motion for Summary Judgment, Doc. 365, P. 2.) However, there is no evidence in the record that any of these acts, even if negligent, were the actual or proximate cause of Wright's injury. Plaintiffs bear the burden of proof on the issue of whether ejections, lighting, or officer positioning were the actual and proximate cause of the shooting. Based on the evidence in the record produced by Plaintiffs, they are unable to meet this burden. There is thus no evidence "such that a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Defendant is therefore entitled to summary judgment.

Based on the uncontroverted evidence, there is no basis for liability for negligent security or supervision. Certainly the post-game shooting on August 24, 2018 was tragic; however, the actions by DCSB were not the proximate cause of Plaintiff Wright's injuries.

As to Plaintiffs contention that DCSB "simply moved [the individuals ejected] from the stadium to a school courtyard next to the stadium," Plaintiffs have not established any evidence this was causally related to the shooting that occurred after the game.  To the contrary, it was the DCSB's practice to escort someone off campus where an ejection was made.  See Depo. B. Stallings P. 35.  There is no evidence that DCSB deviated from this general practice.

In addition, there is no evidence that any deficiencies in the lighting were a factor in the shooting. There is no evidence that the shooter chose the shooting location because of poor lighting. Further, Assistant Principal Stallings testified to being able to see individuals in the courtyard area waiting on transportation. Id. at 45. Additionally, witnesses testified to being able to see the deceased who was located right where the shooting occurred. See Depo. S. Johnson P. 38.  These observations would have only been possible with adequate lighting.  Additionally,

8

Officer Johnson testified that all lights in the courtyard area were working on the night of the incident, and that poor lighting was not a factor in the shooting. Id. at 44. The only thing that Plaintiffs have advanced regarding inadequate lighting is the "After Action Report" that only noted lighting could have been "improved." Notably, this report was not completed until three days after the incident. See Depo. L. Thomas, P. 58. This does not establish that the lighting in the area was negligent. In addition, as discussed below, the placement of the lighting is an operational decision protected by sovereign immunity.

Furthermore, Plaintiffs have not established how a "failure to follow their written policy for Duval County School Police to not 'bunch up' into groups of more than 2" was in any way a proximate cause of the shooting that occurred. It is uncontroverted that there were school administrators, and testimony by those administrators regarding police officers, in the immediate area where the shooting occurred. Officer Johnson explained that they were standing in different positions around the entrance/exit point adjacent to the concession stand, but not bunched up. See Depo. S. Johnson P. 60. However, even assuming the Tactical Action Plan was not explicitly followed, internal operating procedures and directives do not create a legal duty to the general public. Pollock v. Florida Dept. of Highway Patrol, 882 So. 2d 928, 936-37 (Fla. 2004). Therefore, even if that directive was violated, which it was not, it would be inapplicable to prove negligence against DCSB.

**C.     DCSB is immune from liability.**

To the extent that Plaintiffs claim that the shooting resulted from a lack of adequate security plan, inadequate number of personnel present, or training, sovereign immunity requires dismissal of the action. There is no dispute that DCSB is a municipal entity and entitled to sovereign immunity. The Legislature waived sovereign immunity only to the extent provided in Section

9

768.28, Florida Statutes.  Importantly, sovereign immunity has not been waived for claims that involve a governmental entity's discretionary judgmental planning-level decisions, for which there can be no tort liability.  Commercial Carrier Corp. v. Indian River County, 371 So. 2d 1010, 1020-23 (Fla. 1979).

A security plan implemented by a municipal entity is a planning decision covered by sovereign immunity.  Emig v. State, Dep't of Health & Rehab. Servs., 456 So. 2d 1204, 1206 (Fla. 1st DCA 1984).  In Emig, the plaintiff claimed that a state sponsored detention center failed to have security measures that would allow inmates' locations to be ascertained every hour. Id. Upon applying the four-part test, the court found that (1) the center's security measures involved basic governmental policy; (2) the type of security measures were essential to the policy; (3) the center's security measures required the exercise of discretionary judgment on behalf of the center's officials; (4) and the center had lawful authority to make those security decisions. Id.

This was also applied in the context of an individual who was injured at a school basketball game.  School Board of Broward County v. McCall, 2021 WL 1991683 (Fla. 4th DCA 2021).  In McCall, the plaintiff asserted that that the school board failed to provide adequate security and crowd control after an altercation occurred and plaintiff was injured.  Id.  The Fourth District Court of Appeal revered the trial court's order denying defendant's motion for summary judgment, and found that the school's development and implementation of a security plan was a planning level decision for which the school board was immune.  Id. at *4.

Emig and McCall are equally applicable here.  Notwithstanding the lack of evidence and lack of a proximate cause related to any action of DCSB, Plaintiffs speculate that a different security plan might have prevented the shooting.  However, this is the very type of planning level decision protected by sovereign immunity.

IV.    **Conclusion**

Plaintiffs cannot meet their burden of proof on the issues raised in the third amended complaint. There is no evidence supporting their claims relating to the existence of a duty, the breach of any duty, or causation. In addition, DCSB is entitled to sovereign immunity on several aspects of Plaintiffs' claims.

If this case were at trial based on the evidence in the record, DCSB would be entitled to a directed verdict. There exists no genuine issue of material fact to be tried, and Defendant DCSB respectfully requests that this Court grant this motion and enter judgment as a matter of law in its favor.

OFFICE OF GENERAL COUNSEL


*/s/ Brett G. Mereness*
**GABY YOUNG**
**ASSISTANT GENERAL COUNSEL**
Florida Bar No.: 0183709
**BRETT G. MERENESS**
**ASSISTANT GENERAL COUNSEL**
Florida Bar No.: 98691
117 West Duval Street, Suite 480
Jacksonville, Florida 32202
Telephone: (904) 255-5100
Fax: (904) 255-5120
GCYoung@coj.net; HDugan@coj.net
BrettM@coj.net; FFort@coj.net
*Attorneys for Defendant DCSB*

11

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 5, 2021, this document was filed using the Florida

Courts E-Filing Portal.  This document is being served on all counsel of record by the Florida

Courts E-Filing Portal, pursuant to and in compliance with Fla. R. Jud. Admin. 2.516.

*/s/ Brett G. Mereness* _____
Brett G. Mereness

#186

# IN THE SUPREME COURT OF FLORIDA

## Case No. SC19-240

## PRESENTMENT BY THE TWENTIETH STATEWIDE GRAND JURY

This Grand Jury was convened by the Governor and the Supreme Court of Florida in the wake of a massive tragedy—a crime committed within a school. We have come to learn, unfortunately, that less-notorious acts of criminal behavior occur in Florida's schools with alarming regularity yet garner little to no attention. Based upon examination of terabytes of records, testimony from expert witnesses, eyewitnesses including current and former teachers, administrators, board members, law enforcement officers, and government employees, and examination of data from both public and legally-compelled sources, it has become crystal clear to us that this lack of hue and cry is, at least in part, by design: Floridians are being fed a steady diet of misinformation when it comes to the occurrence of crime in schools. Just as a smoldering volcano eventually erupts, the level of criminal activity being tolerated, mislabeled, and uncorrected cannot help but lead inexorably to explosions of tragic proportion. Pressure can only build for so long before demanding release, and it is, at least in some cases, employees and/or representatives of the Districts who exacerbate this precarious situation.

We begin here where our Second and Third Interim Reports left off with respect to the issue of chronic and, in some cases apparently intentional, mislabeling and underreporting of criminal activity in Florida's public schools. While we cannot say that this problem has been demonstrated in all 67 Florida Districts (indeed, many appear to be compliant with the law), it has certainly been shown to be festering in several, including some of the most populous.

Received, Clerk, Supreme Court

*B.H.h*

JAN 15 2021

A True Copy
Attest:
John A. Tomasino, Clerk
Supreme Court of Florida
By _____

*Presentment by the Twentieth Statewide Grand Jury*

EXHIBIT
2

## <u>A QUESTION OF MOTIVATION</u>

We have learned that incentives exist for Districts to appear "safer": safety attracts students and their parents, followed by community and governmental financial support; reductions in crime provide resume-builders for administrators and law-enforcement officials; politicians exploit "successes" as well as "failures." Drafting of legislation, grants or withholding of funding, demands for reporting, and other bureaucratic regimen abound, and it isn't just the students who want a good report card. Yet if students are caught cheating to get a better grade, there are severe consequences; no less should be expected of those in charge of policing and running the schools.

Further, we recognize that equal treatment of student populations along gender, racial, or socioeconomic lines is an ongoing struggle; we applaud all those who strive to remedy inequality wherever it rears its ugly head. Our criminal-justice system is costly and imperfect; we think the legislature was correct to mitigate "zero-tolerance" approaches to help reduce juvenile involvement therein. Unfortunately, some have chosen to exploit these concerns to their own benefit, employing policies intended not to protect vulnerable populations of students, but to generate statistics that can be cherry-picked to reflect more favorably upon themselves. In this scenario, justice becomes a beard for vainglory. Whatever the motivation, the ends cannot justify achievement by dishonest means.

Often this strategy begins with deliberately conflating the *reporting* of incidents to law enforcement with the ultimate *disposition* which may result from investigation of that report. Many Districts have a myriad of disposition alternatives designed specifically to reduce the likelihood that juveniles will actually be arrested or become further enmired in the criminal justice system (specialty courts, civil citations, Memoranda of Understanding, alternative suspension

programs, counseling and therapy, and a wide variety of diversion programs to name a few), and we encourage such efforts where they can be shown to have a positive effect and are aligned with the efforts of stakeholders in the criminal justice system.

However, this is a significantly different concern than the accurate reporting and characterization of the incidents themselves; as we made clear in our Third Interim Report, failing to document or accurately describe the behavior makes no one safer, and deprives those involved of access to such things as counseling or alternative courts where underlying issues might be actually addressed. Construction of an alternate reality serves no public purpose. What we have seen, and condemn herein, are attempts by some to conceal the very occurrence of behavior under the pretense of promoting equality—sacrificing integrity on the altar of transitory accolades. Smearing cosmetic "fixes" over the system's bruises only encourages further abuse; this is not only illogical, but dangerous—and criminal.

Clues can be derived simply from looking at such things as SESIR data, where unexplained gaps in recorded incidents vs. disciplines and mysterious wild variations in the occurrence of certain crimes can be indicative of subterfuge. In fact, employees of the Department of Education periodically review data for anomalies and "flag" potential issues for Districts so the District might look into and, if necessary, correct the data. Beyond this, our more targeted investigation has yielded some disturbing results.

## RIGHTS AND DUTIES

We say all this to establish that the concealment and underreporting of crime in public schools is not a problem confined to one single District by any stretch. It is happening in multiple Districts, and no community should assume they are not being victimized by such policies. School

Board members who do not wish to find themselves in the awkward position of explaining this sort of malfeasance must take steps *now* to investigate whether there is evidence of such behavior in their districts—and the Legislature and Department of Education should mandate they do so. Demand the production of actual police reports. Obtain an external audit or an evaluation from an Inspector General; or settle for bromides and doubletalk without tangible individual accountability, and continue to place your community's children at risk. This is not a difficult choice.

To our fellow citizens: please make yourselves aware of what is being done in your name in the educational environment into which you are sending your children. We are unimpressed with bureaucratic shoulder-shrugging, shopworn promises to "have a conversation," and warmed-over pablum about "formulating policies to enhance future performance" and other jargon-filled banality. We do not reflexively accept facile excuses such as "lack of training" or "computer software glitches" and neither should you— in every instance those excuses have been proffered to us, we have found them completely unpersuasive and lacking in factual support; they are the institutional equivalent of "the dog ate my homework." The Department of Education provides constant training both in person and online for anyone who asks; no computer software has been identified which magically erases the accurate reporting of criminal activity. We do not blithely rely on the statistical Potemkin villages erected by those who have a vested interest in making schools *appear* safer. We encourage a healthy skepticism when it comes to these matters; these are *your* tax dollars, *your* employees, and *your children*—demand better.

We should point out that parents are not without rights in this scenario:

Public school students **_shall_** be in orderly, disciplined classrooms conducive to learning without the distraction caused by disobedient, disrespectful, violent, abusive, uncontrollable, or disruptive students[.]

Section 1002.20, Florida Statutes (2020) (emphasis added). We also mention that members of School Boards and Superintendents of Districts do have statutory obligations:

> When knowledgeable of the likely risk of physical violence in the schools, the *district school board* shall take reasonable steps to ensure that teachers, other school staff, and students are not at undue risk of violence or harm.

Section 1003.32(9), Florida Statutes (2020) (emphasis added); in addition:

> Any district school *superintendent* who knowingly signs and transmits to any state official a report that the superintendent knows to be false or incorrect; who knowingly fails to investigate any allegation of misconduct by instructional personnel or school administrators, as defined in s. 1012.01, which affects the health, safety, or welfare of a student; who knowingly fails to report the alleged misconduct to the department as required in s. 1012.796; or who knowingly fails to report misconduct to the law enforcement agencies with jurisdiction over the conduct pursuant to district school board policy under s. 1001.42(6), forfeits his or her salary for 1 year following the date of such act or failure to act.

Section 1001.51, Florida Statutes (2020) (emphasis added); and finally:

> Each *district school board* shall adopt policies to ensure the accurate and timely reporting of incidents related to school safety and discipline. The district school *superintendent* is responsible for school environmental safety incident reporting. A district school superintendent who fails to comply with this subsection is subject to the penalties specified in law, including, but not limited to, s. 1001.42(13)(b) or s. 1001.51(12)(b), as applicable.

Section 1006.07, Florida Statutes (2020) (emphasis added).

This Presentment should constitute ample notice to Florida's School Districts and their Boards: there is no excuse for cooking the statistical books; yet it happens, and you need to identify it before the problem metastasizes further.

## ONE UNFORTUNATE CASE IN POINT

We will have more to say about other Districts in the future. But one District provided an illustration of these infirmities so flagrant and unambiguous we have little choice but to

acknowledge it now and take direct action. Duval County has its own School Police Department, which has been headed by the same individual since 2015. That Chief Micheal P. Edwards, has actually issued both written and verbal orders to the members of his department to intentionally mislabel and fail to report crimes.

We have learned that there are essentially two "types" of statistics which are influenced by police reporting in the school context. The first of these is the SESIR system, about which we have previously written. SESIR, however, is a creature of administrative reporting; police do not report directly to the Department of Education. Rather, administrators take information regarding both criminal and non-criminal behavior and report the number of those incidents. At most then, police indirectly influence SESIR data because administrators (who almost uniformly have zero actual law enforcement training) rely on the characterizations the officers give to behavior documented in police reports.[1]

The other type of reporting, however, is strictly the province of law enforcement; in Florida, law enforcement agencies are required to report crime statistics regularly to the Department of Law Enforcement, which compiles the data and forwards it to the FBI for inclusion in the Uniform Crime Report (UCR) database. For our purposes here, police reports are either "Offense Reports" (these describe an incident and contain a numerical code corresponding to a particular statutory violation) or "Information Reports" (these reports describe an incident but do *not* contain any numerical UCR code; they would not be forwarded for statistical purposes and thus, if an actual crime were simply written as an "Information Report," that crime would certainly

---

[1] We take this opportunity to reiterate our prior Report's admonition that just as law enforcement officers should not be teaching or running schools, teachers and administrators have no business whatsoever making decisions about whether a crime has been committed or how it should be investigated; that is and should remain solely a law-enforcement function.

not be reported to FDLE, and in all likelihood would not be reported as a SESIR incident unless by some happy accident a particularly savvy administrator spotted it).

We have learned that Duval County *admitted* to the Department of Education that they failed to correctly report SESIR incidents numbering over 2,000; the District blamed a "technical glitch" for the error. The District asserted to us that they changed their software to correct this issue; to the Department of Education, they claimed the flaw was in the Department's system. The reality of the matter is this: Duval County had written policies in place which permitted administrators to claim they had "consulted" with law enforcement when all they had done was call the Duval School Police call center, ask whoever answered the phone for a "case number" without providing any further information, and the Police Department would then provide them a number. This number was used by the administrator to claim "consultation" but in reality, no law enforcement officer actually spoke to the administrator (or any witness or victim) or investigated the incident. Further, Duval County appeared to consider "consultation" with law enforcement to include a simple phone conversation or a brief passing conversation in a hallway, and further that "consultation" was the equivalent of meeting SESIR's requirement that crimes be "Reported to Law Enforcement."

*Au contraire.* The Department of Education had *always* made clear that, as continues to be the case, "the mere presence of, or consultation with an officer is *insufficient* to satisfy SESIR's requirement that an incident be Reported to Law Enforcement." Accordingly, when Duval County tried to report these "consultations" as "reports," the Department rejected their designation, and rightly so. Yet it was not until we began questioning District data that Duval County seemed to

be interested in taking some corrective measures, and as in other jurisdictions, there appears to have been not a single individual held accountable.

## INDIVIDUAL ACCOUNTABILITY

Disturbing as such incompetence may be, it pales in comparison to the overt fraud directed by the Duval County Schools Police Chief. In a series of written Police Operational Procedure Orders (28.01, 28.02, 28.03, and others) between 2016-2020, Edwards directed his officers to specifically *not* report incidents of Battery on a School Official/Employee (a third-degree felony under Florida law) as actual criminal activity. Specifically, he instructed them that (even if they personally observed the crime, or if it was captured on video or seen by others) if the victim "did not wish to proceed"[2], the officer, rather than following the law and completing an Offense Report (for UCR purposes), would "Complete an Information Report" and "close the investigation." Even if the victim did wish to proceed, the officer was categorically prohibited from making an arrest on the scene[3] unless a dangerous weapon was used (making the offense a second-degree felony). This edict was reinforced in multiple Memoranda issued by Edwards during this time frame, and by multiple PowerPoint presentations he gave when conducting officer training. According to the testimony of many individuals before us, no other law enforcement agency treats any crime in this fashion, much less such a serious felony. As a direct result, such crimes would certainly not be

---

[2] Some officers reported they were even encouraged by Edwards to "speak with the victim about whether they really wanted to put the suspect into the system" or similar unsubtle suggestions. The prohibition on immediate arrest referenced below was described by another witness as designed to provide an opportunity for administrators to independently apply similar pressure.

[3] Officers reported that they were also prohibited from making an arrest on scene for Battery on a Law Enforcement Officer, even if they were the only officer present or were the victim of that offense, except in exceptional circumstances.

reported to FDLE, and likely not reported for SESIR purposes either. This conduct is not simply irresponsible; it is absolutely criminal.

We received testimony from representatives of teacher/victims and from current and former officers of varying ranks regarding these written orders. Officers testified that they found the policy distasteful but began to comply, fearing repercussions if they did not; some opted to leave the department altogether. Teachers reported being told that there was nothing the officers could do in some such situations. This testimony was corroborated by an FDLE examination of several years of police reports from the Duval County School Police Department. From 2016-2019, 2,621 Information reports were examined. Within this limited sample, the Information reports documented:

- 150 instances of Battery on a School Employee
- 21 instances of Battery on a Law Enforcement Officer
- 94 instances of Child Abuse
- 157 instances of Lewd/Lascivious Acts
- 23 instances of Child Pornography
- 13 instances of Aggravated Assault
- 39 Instances of Burglary
- 6 instances of Robbery
- 13 instances of Bomb Threats
- 4 instances of Arson (not including one Battery report where a student's hair was lit on fire)
- 8 instances of gang-related activity

The vast majority of these offenses were felonies. Not one of them was written as an Offense Report.

Edwards' behavior was further enabled by the Duval County School Administration, which prepared and issued a series of "cheat sheets" listing various offenses (criminal and otherwise) for which readers were instructed as to whether an incident required a report to police or the issuance of a "CCR number" (the number used for Offense Reports to be sent to FDLE). Edwards took these charts (prepared by an Administration official, Jackie Simmons, who claimed Edwards also had input into their generation) and disseminated them as directives to his officers as well. These charts, however, listed such crimes as Extortion (a second-degree felony), Stalking, Distribution of Counterfeit Drugs, Direct Intentional Threats of School Employees, Teen Dating Violence, and Burning of Flammable Materials among things not requiring reports to either police or the Department of Education. As with other issues, the charts appear to have begun an evolution, once we began requesting records surrounding them, to begin complying with the law; still, Extortion (for example) on the 2020-2021 version is listed as not requiring reports.[4]

We heard testimony from the Superintendent of the Duval County School District, who asserted that in matters such as this, she would defer to Edwards' guidance regarding police procedure and was not familiar with the goings-on we have described. Hopefully such deference will not be the norm going forward, but this testimony bolsters our conclusion that educators and administrators, regardless of how accomplished in their chosen field, are woefully ill-equipped to make law-enforcement decisions, and school police chiefs should *not* be answerable and reporting

---

[4] Though not a separate crime, "Gang Activity or Expression" was listed as recently as 2018-2019 as not requiring a report; as our Third Interim Report pointed out, this resulted in a miniscule fraction of such activity being reported for SESIR purposes (six incidents of nearly 30,000) and a severe underreporting of the gang activity in Duval County Schools, about which we heard extensive testimony and saw numerous video and photographic exhibits.

to the Districts, but rather to the law enforcement agency with geographical jurisdiction (preferably, the County Sheriff).

We received testimony from multiple witnesses (including current and former members of the Duval County School Police Department) that Edwards repeatedly reinforced this particular policy and did so in conjunction with his overriding goal of reducing the number of *reported* crimes and arrests District-wide[5].  He was quoted as repeatedly demanding that officers "stay in your lane," meaning not conduct independent investigations, and telling them that they were to behave not as police but as "advocates with a badge."  Misdemeanor arrests were all but outlawed, and Edwards would direct officers to (for example) write Arson cases as though they were "criminal mischief" and Burglaries as "trespass and theft" (thus magically converting felonies to misdemeanors).  Edwards was described as a very hands-on chief, with the word "micromanager" and even "nanomanager" often being used.  For example, officers who wished to make an arrest often told us that they would be required to seek permission from their Sergeant, who would have to call their Lieutenant, who then called Edwards directly.

Edwards also reportedly discouraged cooperation with other law enforcement agencies such as the State Fire Marshal or the SWAT team seeking to serve felony warrants upon students, in part because if the arrest occurred on school property, it was required to be reported for SESIR purposes.  In one instance, this preoccupation with optics resulted in a situation where a citizen

---

[5] One of the PowerPoints we reviewed indicated that the most common offense for which students were arrested was Battery on School Employee, making it a natural target for Edwards' policies.  Several other PowerPoints emphasized a dramatic reduction in arrests; however, every witness who testified asserted unequivocally that while *arrests* may have declined, the criminal *activity* had certainly not abated and in fact likely increased.  This is borne out by the SESIR data submitted by Duval County, which indicates that the District administrators reported 963 incidents to police in 2016-2017, 838 in 2017-2018, 927 in 2019-2019, and 1,241 in 2019-2020.  The relatively constant (or increasing) level of referrals indicates no reduction in the need for law enforcement intervention.

observed a youth who appeared to be a student place a gun into a backpack and enter a school near dismissal time. The citizen told a school police officer and the officer requested that the school be locked down to locate the gun-toting individual; Edwards refused, as parents gathering for pickup might be alarmed.

In some cases, this philosophy resulted in Edwards actually ordering the "un-arrest" of individuals already in custody. We heard testimony regarding a student arrested for distribution and sale of dozens of drug-laced food items who, after confessing to having essentially created a business selling the items multiple days per week, was actually in handcuffs, waiting in the line for entrance to the Duval County Jail, when Edwards ordered the student's immediate release from custody; when one officer bluntly refused to do so, another was compelled to contact the Jacksonville Sheriff's Office and go release the individual to carry out Edwards' order. We also heard testimony that a student was taken into custody during a high school football game for fighting and disorderly conduct. The officers at the scene intended to either contact the student's parents, cite him (including issuing him a trespass warning to remain away from the location) and release him to their custody or, if they could not be contacted, to arrest the student and remove him from the premises. Edwards, when informed of the situation, ordered the officers to immediately release the student with no further action. The student remained on the premises and, tragically, was shot to death near the end of the game in an altercation which apparently had continued from the previous incident.

Edwards has not only remained in his position where he continues to enjoy a six-figure salary, but has been lauded by the school administration and some outside groups for "reducing crime." We believe the facts have shown this to be a mirage, and should give some cause to regret

their endorsement.  While we certainly do not

lightly come to the following decision, we have reviewed multiple criminal statutes over the course

of our investigation, and find the following to apply to Edwards' conduct as described above:

### 1) Solicitation of Official Misconduct (Third-Degree Felony)

Micheal P. Edwards did solicit a public servant or public contractor to knowingly and intentionally obtain a benefit for any person by *falsifying, or causing another person to falsify,* any official record or official document or obstructing, delaying, *or preventing the communication of information relating to the commission of a felony* that directly involves or affects the government entity served by the public servant or public contractor, and in the course of such solicitation *did command, encourage, or request another person* to engage in specific conduct which would constitute such offense or attempted offense, contrary to sections 838.022, 777.011 and 777.04(2), Florida Statutes.

### 2) Official Misconduct (Third-Degree Felony)

Micheal P. Edwards, while a public servant or public contractor, did knowingly and intentionally obtain a benefit for any person by *falsifying, or causing another person to falsify,* any official record or official document or obstructing, delaying, *or preventing the communication of information relating to the commission of a felony* that directly involves or affects the government entity served by the public servant or public contractor, contrary to sections 838.022 and 777.011, Florida Statutes.

### 3) Falsifying Records (First-Degree Misdemeanor)

Micheal P. Edwards did alter, falsify or avoid any record or did ***cause or procure*** any of the offenses aforesaid to be committed, or was in anywise concerned therein, contrary to Section 839.13, Florida Statutes.

To borrow a phrase, in this instance, the coverup is actually *part* of the crime. It is the

considered opinion of this body that if nothing else, the sheer amount of evidence (both in the form

of written documents and corroborative testimony) makes it impossible to countenance this

behavior from a "public servant." While we hope our exposition makes clear that we certainly do

not believe Duval County is the only locale to suffer from similar issues, the brazenness of this particular situation impels us to begin here.

Ordinarily, we would have issued an Indictment with this Presentment. However, we have been notified that a quirk of Florida law could complicate a prosecution brought via indictment in this narrow circumstance; we intend to advise the Legislature to correct this oversight in a future communication. For now, however, our primary concern is that Edwards be held to account for his actions, and we are informed that the prosecution will proceed via Information brought by the Office of Statewide Prosecution. We encourage and support this action.

Respectfully submitted to the Honorable Jack Tuter, Presiding Judge, this 15 day of January, 2021.

_____
Foreperson, Juror # 7 ,
Twentieth Statewide Grand Jury of Florida.

THE FOREGOING Presentment by the Twentieth Statewide Grand Jury was returned to me in open court this 15 day of January, 2021.

_____
HON. JACK TUTER, Presiding Judge
Twentieth Statewide Grand Jury of Florida.

I, Nicholas B. Cox, Statewide Prosecutor and Legal Advisor, Twentieth Statewide Grand Jury, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this presentment on this _15_ day of January, 2021.

NICHOLAS B. COX
Statewide Prosecutor
Twentieth Statewide Grand Jury of Florida

I, Richard Mantei, Assistant Statewide Prosecutor and Assistant Legal Advisor, Twentieth Statewide Grand Jury, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this presentment on this _15_ day of January, 2021.

RICHARD MANTEI
Assistant Statewide Prosecutor
Twentieth Statewide Grand Jury of Florida

I, Joseph Spataro, Chief Assistant Statewide Prosecutor and Assistant Legal Advisor, Twentieth Statewide Grand Jury, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this presentment on this _15_ day of January, 2021.

JOSEPH SPATARO
Chief Assistant Statewide Prosecutor
Twentieth Statewide Grand Jury of Florida

I, Jeremy B. Scott, Chief Assistant Statewide Prosecutor and Assistant Legal Advisor, Twentieth Statewide Grand Jury, hereby certify that I, as authorized and required by law, have advised the Grand Jury which returned this presentment on this 15th day of January, 2021.

JEREMY SCOTT
Chief Assistant Statewide Prosecutor
Twentieth Statewide Grand Jury of Florida

IN THE CIRCUIT COURT, FOURTH JUDICIAL
CIRCUIT IN AND FOR DUVAL COUNTY, FLORIDA.

CASE NO.: 16-2019-CA-007070

DIVISION: CV-C

KALIA LUCAS
and KHLAYAH WRIGHT,

      Plaintiffs,

v.

DUVAL COUNTY SCHOOL BOARD,
and MICHEAL P. EDWARDS,
in his individual capacity.

      Defendants.

_____/

### FOURTH AMENDED COMPLAINT

    Plaintiffs, Khlayah Wright and her mother Kalia Lucas, sue Defendants, Duval County

School Board, and Micheal P. Edwards and allege:

### Parties, Jurisdiction and Venue

    1.    This is an action for damages that exceed $30,000.00, exclusive of costs and

interest.

    2.    Venue is proper in Duval County because the acts and/or omissions giving rise to

this litigation occurred here.

    3.    At all times material, Plaintiff Khlayah Wright was a resident of Duval County,

Florida.

    4.    At all times material, Plaintiff Kalia Lucas was a resident of Duval County, Florida.

    5.    At all times material, Plaintiff Kalia Lucas, was the parent of Khlayah Wright.



ALL-STATE LEGAL®    EXHIBIT    3

6.      Defendant Duval County School Board ("DCSB") is a political subdivision that is responsible for the control, operation, organization, management, administration and supervision of public schools in Duval County, Florida.

7.      Duval County School Police Department is, and at all times material was, the police arm of Defendant Duval County School Board.

8.      At all times material, Defendant Micheal Edwards was employed by Duval County School Board as the director of the Duval County School Police Department.

9.      Defendant Edwards engaged in the conduct complained of in the course and scope of his employment as the director of the Duval County School Police Department and under the color of law.  Defendant Edwards is sued in his individual capacity.

10.     As of August 24, 2018, Khlayah Wright was a student enrolled at Robert E. Lee High School.

11.     Robert E. Lee High School (hereinafter "Lee H.S.") is, and was at all times material, located within Jacksonville, Duval County, Florida.

12.     William M. Raines High School (hereinafter, "Raines H.S.") is, and was at all times material, located in Jacksonville, Florida.

13.     Defendant Duval County School Board is the proper entity for actions and omissions constituting negligence by employees and agents of both Raines H.S. and Lee H.S.

14.     All conditions precedent to the filing of this action have been met.  Specifically, Plaintiff Khlayah Wright satisfied the pre-suit notice requirements in 768.28(6), *Fla. Stat.*, through written notice to the City of Jacksonville, the Florida Department of Financial Services, and Defendant School Board on September 30, 2020.  Plaintiff Kalia Lucas satisfied the pre-suit notice

requirements in 768.28(6), *Fla. Stat.*, through written notice to the City of Jacksonville, the Florida Department of Financial Services, and Defendant School Board on September 28, 2020.

### General Allegations

15.　On or about August 24, 2018, Khlayah Wright attended a football game between Raines H.S. and Lee H.S.

16.　The football game between Raines H.S. and Lee H.S. on August 24, 2018 was held at Raines H.S.

17.　The football game between Raines H.S. and Lee H.S. was a regular school-sponsored activity, within the Jurisdiction of the School Board.

18.　After the football game ended, an assailant armed with a gun entered the grounds of Raines H.S. and opened fire into a crowd of spectators who were in the process of leaving the area of the football field.

19.　Khlayah Wright was in the crowd of spectators who were in the process of leaving the area of the football field at Raines H.S.

20.　The gunfire struck and injured Khlayah Wright.

21.　Khlayah Wright was on the Raines H.S. premises at the time she was struck by the gunfire.

22.　The armed assailant was on the Raines H.S. premises at the time he fired the shot that struck Khlayah Wright.

23.　The gunfire and Khlayah Wright's injury occurred within 30 minutes after the end of the aforementioned football game.

24.　Khlayah Wright suffered a permanent total disability as a result of the shooting. Specifically, a November 11, 2019 Social Security Administration letter to Kalia Lucas regarding

her daughter states on page 1: "As of July 2019 she met all the rules to be eligible for SSI based on being disabled."  Page 2 of the letter states: "She was found disabled on July 2, 2019."

### COUNT I – Negligence of Duval County School Board
### (general negligence, Wright v. DCSB)

25.　　Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-24.

26.　　At all times material, Defendant owed a general duty of supervision to the students placed within its care, including Khlayah Wright

27.　　Defendant also owed a duty, at all times material, to protect its students, including Khlayah Wright, from assaults by other students and non-students.

28.　　Defendant breached its general duty of supervision and breached its duty to protect Khlayah Wright from assaults by other students and non-students.

29.　　As a direct and proximate result, Khlayah Wright suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, loss of ability to earn money, and aggravation of a previously existing condition.

30.　　Khlayah Wright's losses are either permanent or continuing in nature and Khlayah Wright will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment for damages against Defendant and further demands trial by jury on all issues.

### COUNT II – Negligence of Duval County School Board
### (premises liability, Wright v. DCSB)

31.　　Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-25.

32.　　At all times material, Khlayah Wright was an invitee on the Raines H.S. premises.

33.　　Prior to the shooting, Defendant was on notice of the shooter's violent nature and past dangerous actions.

4

34.     Defendant knew or should have known that the shooter was a danger to any person lawfully on the Raines H.S. premises.

35.     Violent actions by the shooter, including the shooting that occurred on the Raines H.S. premises, were reasonably foreseeable to Defendant.

36.     At all times material, Defendant had a duty to protect invitees, including Khlayah Wright, from foreseeable intentional or criminal acts of students and non-students.

37.     Defendant breached its duty to protect invitees, including Khlayah Wright, from a foreseeable intentional or criminal act.

38.     As a direct and proximate result, Khlayah Wright suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, loss of ability to earn money, and aggravation of a previously existing condition.

39.     Khlayah Wright's losses are either permanent or continuing in nature and Khlayah Wright will suffer these losses in the future.

**WHEREFORE**, Plaintiff demands judgment for damages against Defendant and further demands trial by jury on all issues.

**COUNT III – (Prior claim against ESA, which has been dismissed)**

**COUNT IV – Plaintiff Kalia Lucas' Claim for Medical Expenses**
**(Lucas v. DCSB)**

40.     Plaintiffs re-allege paragraphs 1-39 as if fully set out herein.

41.     At all times material, Plaintiff Kalia Lucas was the mother of Plaintiff Khlayah Wright.

42.     As a direct and proximate result of the negligence of both Defendants, Plaintiff Kalia Lucas incurred expenses of hospitalization, medical and nursing care and treatment for Plaintiff Khlayah Wright until age 18.

**WHEREFORE**, Plaintiff Kalia Lucas demands judgment for damages against Defendants and further demands trial by jury on all issues.

### COUNT V – 42 U.S.C. § 1983 Civil Rights Action
**(Wright v. Edwards in his individual capacity)**

43.     Plaintiff re-alleges paragraphs 1-24 as if fully set out herein.

44.     As previously alleged, Defendant Edwards was the director the Duval County School Police Department and began serving in that role in 2015.

45.     During his time as the director of DCSP, Director Edwards did not maintain accurate records of criminal activity at Duval County Schools.

46.     A grand jury investigated Defendant DCSB and Defendant Edwards and found: "Chief Micheal P. Edwards, has actually issued both written and verbal orders to the members of his department to intentionally mislabel and fail to report crimes."

47.     Defendant DCSB knew or should have known that Defendant Edwards was not keeping accurate crime records regarding Duval Schools.  For example, an August 10, 2016 First Coast News article bears the headline: "Former Duval Schools Officers Speak Out Against Department."

48.     The article references a former Officer named John Hardin, and states: "During part of his tenure with Duval School Police, he worked at Lake Shore Middle School and says he was instructed not to arrest students when he thought a student should have been arrested.  He says a school district policy prevented him from making an initial arrest when a student battered a teacher."

49.     The above article states further: "It's going to get people hurt," Hardin says. "It's going to get students hurt. It's going to get faculty hurt."

6

50.    Senior leadership at DCSB knew or should have known about the problems identified in the 2016 First Coast News story. For example, the article states: "The superintendent [Dr. Nikolai Viti] has touted the district's declining arrest numbers. He too declined multiple requests to be interviewed for this story."

51.    Defendant DCSB and Defendant Edwards failed to report accurate crime data to the Florida Department of Law Enforcement.

52.    Defendant DCSB and Defendant Edwards failed to report accurate crime data in School Environmental Safety Incident Reporting.

53.    Defendant DCSB and Defendant Edwards' underreporting of crime was part of a scheme to convince taxpayers, the State government, and local government that the Duval County School Police force was effective, efficient, and meeting its responsibilities.

54.    Defendant DCSB failed to correctly report SESIR incidents numbering over 2,000.

55.    Joerod Adams was an attendee at the subject Raines versus Lee football game.

56.    In the stands during the game, Joerod Adams and Robert Howard got into a fight.

57.    Joerod Adams was ejected from the stadium by Duval School Police.

58.    Robert Howard was ejected from the stadium by the Duval School Police.

59.    A Duval School Police Officer intended to either trespass or arrest Joerod Adams.

60.    At that time, Defendant Edwards intervened, and in conformity with the scheme to show a low number of criminal infractions, the Duval School Police Officer was instructed by Defendant Edwards to neither trespass nor arrest Joerod Adams.

61.    Joerod Adams was not arrested or trespassed because Defendant DCSB and Defendant Edwards did not want to create a record that any criminal activity had occurred.

62.     Moments after the football game ended, Robert Howard shot Joerod Adams in the head in a campus courtyard adjacent to the football stadium, killing him instantly.   Plaintiff Khlayah Wright was an innocent bystander and was shot by a stray bullet.

63.     Defendant Edwards, acting under color of state law, deprived Plaintiff Khlayah Wright of rights protected under the federal constitution, or federal laws.  Specifically, Defendant Edwards deprived Khlayah Wright of her Fourteenth Amendment rights through policies, customs, and practices which deprived her of life, liberty, or property.

64.     Defendant Edwards was guilty of a reckless or deliberately indifferent scheme of refusing to arrest wrongdoers to the detriment of the reasonable safety of youths at Duval County School events, including the safety of Plaintiff Khlayah Wright, by consciously failing to take actions to protect the youths, including Plaintiff Khlayah Wright.

65.     This scheme included consciously refusing to trespass and/or arrest Joerod Adams and Robert Howard during the initial fight.   This scheme of keeping reported arrests and crimes low resulted in the foreseeable escalation of the initial fight and got innocent students hurt.  As a direct and proximate result of Defendant Edwards' reckless and deliberate indifference, Plaintiff suffered harms and losses including violation of her constitutional rights.

66.     Defendant Edwards' policy or custom of underreporting criminal activity, discouraging arrests, and "un-arresting" certain individuals, including Joerod Adams, created a dangerous condition at the subject football game, which was a proximate cause of Plaintiff Khlayah Wright's injuries and deprivation of constitutional rights.

**WHEREFORE**, Plaintiff Khlayah Wright demands judgment in her favor for economic and non-economic damages, trial by jury, attorneys fees, and any other relief deemed appropriate.

## COUNT VI – 42 U.S.C. § 1983 Civil Rights Action (Monell Claim)
### (Wright v. DCSB)

67.     Plaintiff re-alleges paragraphs 1-24 as if fully set out herein.

68.     As previously alleged, it was the policy and custom of Defendant Duval County School Board to inadequately report actionable offenses and purposefully maintain inaccurate records of criminal activity at Duval County Schools.

69.     A grand jury investigated Defendant DCSB and Defendant Edwards and found: "Chief Micheal P. Edwards, has actually issued both written and verbal orders to the members of his department to intentionally mislabel and fail to report crimes."

70.     Defendant DCSB knew or should have known that Defendant Edwards was not keeping accurate crime records regarding Duval Schools.  For example, an August 10, 2016 First Coast News article bears the headline: "Former Duval Schools Officers Speak Out Against Department."

71.     The article references a former Officer named John Hardin, and states: "During part of his tenure with Duval School Police, he worked at Lake Shore Middle School and says he was instructed not to arrest students when he thought a student should have been arrested.  He says a school district policy prevented him from making an initial arrest when a student battered a teacher."

72.     The above article states further: "It's going to get people hurt," Hardin says. "It's going to get students hurt. It's going to get faculty hurt."

73.     Senior leadership at Defendant DCSB knew or should have known about the problems identified in the 2016 First Coast News story. For example, the article states: "The superintendent [Dr. Nikolai Viti] has touted the district's declining arrest numbers. He too declined multiple requests to be interviewed for this story."

74.     Defendant DCSB and Defendant Edwards failed to report accurate crime data to the Florida Department of Law Enforcement.

75.     Defendant DCSB and Defendant Edwards failed to report accurate crime data in School Environmental Safety Incident Reporting.

76.     Defendant DCSB and Defendant Edwards' underreporting of crime was part of a scheme to convince taxpayers, the State government, and the local government that the Duval County School Police force was effective, efficient, and meeting its responsibilities.

77.     Defendant DCSB failed to correctly report SESIR incidents numbering over 2,000.

78.     These actions were done pursuant to the longstanding policies, practices and/or customs of Defendant DCSB and its police force.

79.     Joerod Adams was an attendee at the subject Raines versus Lee football game.

80.     In the stands during the game, Joerod Adams and Robert Howard got into a fight.

81.     Joerod Adams was ejected from the stadium by Duval School Police.

82.     Robert Howard was ejected from the stadium by the Duval School Police.

83.     A Duval School Police Officer intended to either trespass or arrest Joerod Adams.

84.     At that time, Defendant Edwards intervened, and in conformity with the scheme to show a low number of criminal infractions, the Duval School Police Officer was instructed by Defendant Edwards to neither trespass nor arrest Joerod Adams.

85.     Joerod Adams was not arrested or trespassed because Defendant DCSB and Defendant Edwards did not want to create a record that any criminal activity had occurred.

86.     Moments after the football game ended, Robert Howard shot Joerod Adams in the head in a campus courtyard adjacent to the football stadium, killing him instantly.  Plaintiff Khlayah Wright was an innocent bystander and was shot by a stray bullet.

87.    Defendant DCSB, through its longstanding policies, practices and/or customs, deprived Plaintiff Khlayah Wright of rights protected under the federal constitution, or federal laws.   Specifically, Defendant DCSB's policies, practices and/or customs demonstrated a deliberate indifference on the part of Defendant DCSB and its policy makers, including Defendant Edwards, to the constitutional rights of the students and teachers of the Duval County Schools and were the cause of the violations of Khlayah Wright's Fourteenth Amendment rights which deprived her of life, liberty, or property.

88.    The conduct of Defendant DCSB in developing the aforementioned scheme and policy is, and at all times material was, recklessly or deliberately indifferent to the reasonable safety of youths at Duval County School events, including the safety of Plaintiff Khlayah Wright, by consciously failing to take actions to protect the youths, including Plaintiff Khlayah Wright.

89.    This scheme included consciously refusing to trespass and/or arrest Joerod Adams and Robert Howard during the initial fight.   This scheme of keeping reported arrests and crimes low resulted in the foreseeable escalation of the initial fight and got innocent students hurt.   As a direct and proximate result of Defendant DCSB's reckless and deliberate indifference, Plaintiff suffered harms and losses including violation of her constitutional rights.

90.    Defendant DCSB's policy and/or custom of underreporting criminal activity, discouraging arrests, and "un-arresting" certain individuals, including Joerod Adams, created a dangerous condition at the subject football game, which was a proximate cause of Plaintiff Khlayah Wright's injuries and deprivation of constitutional rights.

**WHEREFORE**, Plaintiff Khlayah Wright demands judgment in her favor for economic and non-economic damages, trial by jury, attorneys fees, and any other relief deemed appropriate.

**SPOHRER & DODD, P.L.**

**/s/MATTHEW W. SPOHRER**

**ROBERT F. SPOHRER, ESQUIRE**
Florida Bar No.: 184500
**MATTHEW W. SPOHRER, ESQUIRE**
Florida Bar No:  0062534
76 S. Laura Street, #1701
Jacksonville, FL 32202
Phone: (904) 309-6500
Facsimile: (904) 309-6501
Email:  rspohrer@sdlitigation.com
            jheape@sdlitigation.com
            mspohrer@sdlitigation.com
            eservice@sdlitigation.com
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was e-filed and e-served through the State of

Florida e-portal system to Gaby Young, Esquire and Brett Mereness, Esquire; Office of General

Counsel; 117 W. Duval St., Suite 480, Jacksonville, FL 32202, Attorneys for Defendant Duval

County School Board, this 24th day of August, 2022 at the following e-mail addresses:

gcyoung@coj.net
hdugan@coj.net
brettm@coj.net
bosburn@coj.net

**/s/Matthew W. Spohrer**
Attorney